UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
INES BRICENO, ESMERALDA LEON, and
FRANCISCO VARGAS AGUIRRE, individually
and on behalf of all other person
similarly situated who were employed
by USI SERVICES GROUP, INC., ULTIMATE
SERVICES INC., and FRED GOLDRING
and/or any other entities affiliated
with or controlled by USI SERVICES
GROUP, INC., ULTIMATE SERVICES INC.,
and FRED GOLDRING,                              MEMORANDUM & ORDER
                                                09-CV-4252(JS)(AKT)

                        Plaintiffs,


            -against-

USI SERVICES GROUP, INC., ULTIMATE
SERVICES INC., and FRED GOLDRING,
and/or any other entities affiliated
with or controlled by USI SERVICES
GROUP, INC., ULTIMATE SERVICES INC.,
and FRED GOLDRING,

                        Defendants.
----------------------------------------X
APPEARANCES
For Plaintiffs:     Jeffrey Kevin Brown, Esq.
                    Jessica Lorraine Parada, Esq.
                    Lenard Leeds, Esq.
                    Michael Alexander Tompkins, Esq.
                    Leeds Brown Law, P.C.
                    One Old Country Road, Suite 347
                    Carle Place, NY 11514

                    Kara Sue Miller, Esq.
                    Leonor H. Coyle, Esq.
                    Lloyd Robert Ambinder, Esq.
                    Suzanne B. Leeds, Esq.
                    Virginia & Ambinder LLP
                    111 Broadway, Suite 1403
                    New York, NY 10006

For Defendants:        Michael A. Saffer, Esq.
                       Mandelbaum, Salsburg, Gold, Lazris, Discenza
                           & Steinberg, PC
                       155 Prospect Avenue
                       West Orange, NJ 07052

SEYBERT, District Judge:

Presently pending before the Court is Ines Briceno, Esmeralda Leon,[1] and Francisco Vargas Aguirre's (collectively the "Named Plaintiffs") motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. For the following reasons, the Named Plaintiffs' motion is DENIED.

BACKGROUND

The Named Plaintiffs commenced this action on October 2, 2009 against USI Services Group, Inc. ("USI"), Ultimate Services Inc. ("Ultimate Services"), and Fred Goldring (collectively, "Defendants"), asserting claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207, for unpaid overtime, under New York Labor Law ("NYLL") § 190 and N.Y. COMP. CODES R. & REGS. tit. 12 §§ 142-2.2, 2.4 for unpaid wages, unpaid overtime, and spread of hours premiums, and under New Jersey Wage and Hour Law ("NJWHL") §§ 34:11-4.2, 34:11-56a4 for unpaid wages and unpaid overtime.

---

[1] Plaintiffs' counsel has misspelled the names of Ms. Briceno and Ms. Leon in the caption and intermittently throughout the course of this litigation. The Court has corrected the caption above to reflect the correct spellings. The Clerk of the Court is directed to amend the docket accordingly.

I.    Factual Background

    A.    The Parties

        Defendant USI is the parent company of Defendant Ultimate Services. (Ray Decl. Ex. A, Baranker Dep. Tr. 13.) Ultimate Services is engaged in the business of providing janitorial services to approximately 150 different department and retail stores throughout New York and New Jersey. (Compl. ¶ 20; Baranker Decl. ¶ 2.) Both Ultimate Services and USI are located in New Jersey. (Compl. ¶¶ 10-11.) Defendant Goldring is the owner and Chief Operating Officer of USI. (Ambinder Decl. Ex. A, Baranker Dep. Tr. 17.)

        The Named Plaintiffs were all employed by Defendants as janitors in the J.C. Penney store in Massapequa, New York. (Ray Decl. Ex. D, Briceno Dep. Tr. 25; Ambinder Decl. Ex. E, Vargas Aff. ¶ 3; Ambinder Decl. Ex. F, Leon Aff. ¶ 3.) Ms. Briceno worked there from approximately 2002 through 2003 and again from approximately 2006 through 2009. (Ambinder Decl. Ex. D, Briceno Aff. ¶ 3.) Mr. Vargas worked there from approximately 2001 through 2003. (Ambinder Decl. Ex. E, Vargas Aff. ¶ 3.) And Ms. Leon worked there from approximately 2004 through 2006 and again from 2007 through 2009. (Ambinder Decl. Ex. F, Leon Aff. ¶ 3.)

B.  <u>Defendants' Timekeeping Policies</u>

Each of USI's approximately 150 worksites is run by a store supervisor who is responsible for hiring and training new employees, ordering supplies, and preparing weekly work schedules. (Ray Decl. Ex. A, Baranker Dep. Tr. 22, 91.) Prior to 2006, the store supervisors were also responsible for generating weekly timesheets. (Ray Decl. Ex. B, Golub Dep. Tr. 14.) Each day, employees would manually enter their time on these timesheets,[2] which were faxed to USI's headquarters by the store supervisor at the end of the week. (Ray Decl. Ex. B, Golub Dep. Tr. 14.) Employees' time would then be manually entered into Defendants' payroll system. (Ray Decl. Ex. B, Golub Dep. Tr. 14.)

In 2006, Defendants switched to a telephonic timekeeping system using a software program called MITC. (Ray Decl. Ex. B, Golub Dep. Tr. 10.) Under this new system, each employee was assigned a pin number and given a 1-800 number to call at the beginning and end of his or her shift each day. (Ray Decl. Ex. B, Golub Dep. Tr. 41-42.) Upon calling the 1-800 number, employees were directed by an automated recording to enter their pin number, their department number, and the code for their job title. (Ray Decl. Ex. B, Golub Dep. Tr. 42.)

---

[2] Employees were also required to log in and out for lunch and other breaks. (<u>See</u>, <u>e.g.</u>, Ray Decl. Ex. N.)

MITC would note the time of the call and transfer that information to Defendants' payroll records. (Ray Decl. Ex. B, Golub Dep. Tr. 10.) Employees were required to call from designated phones at their worksites or their time would not be recorded. (Ray Decl. Ex. B, Golub Dep. Tr. 44-45.) This new system was phased in over a three-to-six month period so that all employees could be properly trained on how to use the MITC software. (Ray Decl. Ex. B, Golub Dep. Tr. 40-41.)

Any errors in an employee's time could be corrected either informally by the employee or his or her supervisor calling headquarters or formally by the employee submitting a "MITC/JCI Phone Problem Call Log" form. (Ray Decl. Ex. B., Golub Dep. Tr. 70-71.) The store supervisors continued using paper timesheets as a backup. (Baranker Decl. ¶ 4.) The MITC software also ran periodic reports to ensure that all employees were logging in and out properly. (Ray Decl. Ex. B, Golub Dep. Tr. 47-49, 56-57.)

The Named Plaintiffs assert, however, that the MITC software was unreliable and often out-of-order, thus making it impossible for employees to log in and out at the times they actually arrived at and left work. (See, e.g., Ambinder Decl. Ex. D., Briceno Aff. ¶¶ 7-8; Ambinder Decl. Ex. F, Leon Aff. ¶¶ 8-9.) They contend that they attempted to report the timekeeping errors to Defendants either directly or through

their store supervisor, but that they were rarely, if ever, compensated for that lost time. (See, e.g., Ambinder Decl. Ex. D., Briceno Aff. ¶¶ 9, 12, 14; Ambinder Decl. Ex. E, Vargas Aff. ¶¶ 10, 13, 15; Ambinder Decl. Ex. F, Leon Aff. ¶¶ 9, 12, 14.)

At the same time this new timekeeping policy was implemented, Defendants began automatically deducting meal breaks from employees' scheduled shifts. (Ray Decl. Ex. B., Golub Dep. Tr. 31.) Defendants informed all employees of this new policy before implementing it and eventually began printing the policy on their paychecks. (Ray Decl. Ex. B., Golub Dep. Tr. 46, 80.) The Named Plaintiffs assert, however, that they rarely took their scheduled meal breaks, yet Defendants deducted the time anyway. (See, e.g., Ambinder Decl. Ex. D., Briceno Aff. ¶ 5; Ambinder Decl. Ex. E, Vargas Aff. ¶ 5; Ambinder Decl. Ex. F, Leon Aff. ¶ 5.)

C.   "Ghost Employees" in the Massapequa J.C. Penney

In or around April 2009, Defendants were notified by J.C. Penney personnel that the store supervisors in the Massapequa store were falsifying time records. (Ray Decl. Ex. A, Baranker Dep. Tr. 49-52; Ray Decl. Ex. G.) The supervisors would not inform Defendants when an employee quit or was fired. Instead, he would hire new employees and/or allow existing employees to work extra shifts using the departed employee's (the "ghost employee") pin number. The supervisors would

receive the ghost employee's check and pay his employees in cash. (See Ray Decl. Ex. A, Baranker Dep. Tr. 51-52.)

This affected all three of the Named Plaintiffs. Ms. Briceno worked for Defendants from 2002 through 2003 and again from 2006 through 2009. (Ambinder Decl. Ex. D, Briceno Aff. ¶ 3.) Yet Defendants' records only show that she was employed from 2002 through 2003 (see Baranker Decl. ¶ 6) because from 2006 through 2009 she was told to log in and out using her daughter's pin (Ray Decl. Ex. D, Briceno Dep. Tr. 23-26). Ms. Leon regularly worked two shifts each day: in the morning she would log in and out as herself, but in the afternoon (at her supervisor's direction) she logged in and out using Ms. Briceno's son's pin.[3] (Ray Decl. Ex. C, Leon Dep. Tr. 7.) And Defendants have payroll records for Mr. Vargas through 2008 (Ambinder Supp. Decl. Ex. B2) even though he stopped working for Defendants in 2003 (Ambinder Decl. Ex. E, Vargas Aff. ¶ 3; Ambinder Decl. Ex. S, Vargas Dep. Tr. 78-79) because other employees continued to log in and out using his pin number (see Ambinder Decl. Ex. R, Hernandez Vargas Dep. Tr. 74-77, 89 (Mr. Vargas' son testifying that he would log in and out using his father's pin and would receive checks payable to his father); Ambinder Decl. Ex. M, Chicas Aff. ¶¶ 11-12 (employee stating

_____

[3] Ms. Briceno also testified that at least two other employees were using her son's pin. (Ray Decl. Ex. D, Briceno Dep. Tr. 46-48).

that he was paid in cash by Mr. Vargas)).  There is no evidence in the record that this occurred at any of Defendants' other locations.

## II. <u>Procedural Background</u>

The Named Plaintiffs commenced this action on behalf of themselves and all other similarly situated employees of Defendants.  They seek damages under the FLSA for unpaid overtime wages, under NYLL for unpaid wages, overtime, and spread of hours premiums, and under NJWHL for unpaid wages and overtime.

In June 2010, the Court certified a collective action under the FLSA consisting of "all of Defendants' service employees who worked at the J.C. Penney in Massapequa, New York, between June 7, 2008 and the present." (Docket Entry 27, at 8.) After additional briefing, in August 2010, the Court expanded the collective action to include "all of Defendants' service employees, regardless of the location where they worked," who were employed from June 6, 2008 through the present. (Docket Entry 40, at 2.)  Approximately 180 individuals have opted into the FLSA portion of this lawsuit.

On October 7, 2011, the Named Plaintiffs moved for class certification under Rule 23 of the Federal Rules of Civil Procedure to adjudicate the NYLL and NJWHL claims.  This motion is presently pending before the Court.

<u>DISCUSSION</u>

Before turning to the question of whether Rule 23 class certification is proper, the Court must address Defendants' argument that this Court should decline to exercise supplemental jurisdiction over the Named Plaintiffs' NYLL and NJWHL claims.

I.   <u>Supplemental Jurisdiction</u>

A district court's exercise of supplemental jurisdiction is governed by 28 U.S.C. § 1367, which provides in relevant part:

> in any civil action of which the district courts have original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). "For purposes of section 1367(a), claims 'form part of the same case or controversy' if they 'derive from a common nucleus of operative fact.'"  <u>Shahriar v. Smith & Wollensky Rest. Grp., Inc.</u>, 659 F.3d 234, 245 (2d Cir. 2011) (quoting <u>Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.</u>, 373 F.3d 296, 308 (2d Cir. 2004)).  Here, Defendants do not dispute that the Named Plaintiffs' state and federal claims derive from a common nucleus of operative facts as they all relate to

Defendants' automatic meal deduction policy and recordkeeping system.

Nonetheless, a district court may decline to extend supplemental jurisdiction under section 1367(a) if:

> (1)   the claim raises a novel or complex issue of State law,
>
> (2)   the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3)   the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4)   in exceptional circumstances, there are compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Defendants argue that the Court should decline to extend supplemental jurisdiction under section 1367(c)(2) because "the sheer difference in size between the FLSA collective action and the proposed class action demonstrates predominance of the state claims." (Defs. Opp. 12.) The Court disagrees. The Second Circuit has explicitly rejected this argument finding that "the fact that there are more class members in the state law class action than those in the FLSA collective action should not lead a court to the conclusion that a state claim 'substantially predominates' over the FLSA action, as section 1367(c) uses that phrase." Shahriar, 659 F.3d at 246 (internal quotation marks and citation

omitted); see also Ervin v. OS Rest. Servs., Inc., 632 F.3d 971,
981 (7th Cir. 2011) ("[T]he disparity between the number of FLSA
plaintiffs and the number of state-law plaintiffs is not enough
to affect the supplemental jurisdiction analysis. In the
majority of cases, it would undermine the efficiency rationale
of supplemental jurisdiction if two separate forums were
required to adjudicate precisely the same issues because there
was a different number of plaintiffs participating in each
claim.").[4]

Further, "[s]ection 1367(c)(2) requires that a state
law claim 'substantially predominate' over a federal claim
before a district court has discretion to refuse supplemental
jurisdiction." Shahriar, 659 F.3d at 246. Here, Plaintiffs'
overtime claims under the FLSA, the NYLL, and the NJWHL are
factually and legally identical, and, while their claims for
unpaid wages and spread-of-hours premiums under state law are

_____

[4] Defendants cite to De Asencio v. Tyson Foods, Inc., 342 F.3d
301 (3d Cir. 2003), in support of their argument that the Court
should decline to exercise supplemental jurisdiction over the
NYLL and NJWHL claims. The Court, however, finds De Ascencio to
be inapplicable to the present case. Although the Third Circuit
in De Ascencio found that the district court's exercise of
supplemental jurisdiction over state labor law class claims in
an FLSA collective action was an abuse of discretion, the Third
Circuit was applying section 1367(c)(1)--not section 1367(c)(2)
as suggested by Defendants. Id. at 311-312. And Defendants do
not argue, nor could they, that the Court should decline to
extend supplemental jurisdiction under section 1367(c)(1) as the
Named Plaintiffs' state law claims do not raise any novel or
particularly complex issues of state law.

legally distinct from the FLSA claims, they are based on the same factual predicate--namely, Defendants' pay practices. Thus, the Court cannot conclude that the state law claims "substantially predominate" over the federal claims. See, e.g., Whitehorn v. Wolfgang's Steakhouse, Inc., 275 F.R.D. 193, 197 (S.D.N.Y. 2011); cf. Damassia v. Duane Reade, Inc., 250 F.R.D. 152, 162-63 (S.D.N.Y. 2008) ("In an overtime case brought under both the NYLL and the FLSA, the factual overlap between the federal claims and the state claims is virtually total, so it would ill serve the interests of convenience or judicial economy to relitigate in state court the defendants' pay practices." (internal quotation marks and citation omitted)).

Accordingly, the Court will not decline to extend supplemental jurisdiction over the Named Plaintiffs' state law claims at this time.

## II.  Class Certification Under Rule 23

Plaintiffs seek to certify a class of approximately 5,000 people consisting of:

> All current and former employees of USI SERVICES GROUP, INC. and ULTIMATE SERVICES, INC., who performed work as service employees for Defendants in New York from October 2, 2003 through the present, and in New Jersey from October 2, 2007 through the present. This does not include supervisors, officers, executive, managerial or administrative personnel.

(Ambinder Decl. ¶ 1.)  For this putative class to be certified under Rule 23, Plaintiffs must establish, by a preponderance of the evidence, that the class meets the four prerequisites set forth in subsection (a) and fits into one of the categories of class actions enumerated in subsection (b).  FED. R. CIV. P. 23; see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 201-02 (2d Cir. 2008).  The Court, in determining whether these requirements have been satisfied, may be required to assess the merits of the underlying claims, so long as they are related to one of the Rule 23 requirements.  See Miles v. Merrill Lynch & Co. (In re Initial Pub. Offerings Sec. Litig.), 471 F.3d 24, 41 (2d Cir. 2006); Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181, 1188 n.15 (11th Cir. 2003) ("Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." (citing Gen. Tel. Co. v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)).

Further, although "a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met," In re Initial Pub. Offerings, 471 F.3d at 41; see also Teamsters, 546 F.3d at 204 ("A court [must]

13

receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." (internal quotation marks and citation omitted)), the requirements should be "given liberal rather than restrictive construction," Marisol A. v. Giuliani, 126 F.3d 372, 377 (2d Cir. 1997).

A.   Prerequisites

To be certified under Rule 23, a putative class must establish that:

> (1)   the class is so numerous that joinder of all members is impracticable;
>
> (2)   there are questions of law or fact common to the class;
>
> (3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)   the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).   "Additionally, while it is not explicitly spelled out in Rule 23, courts have added an 'implied requirement of ascertainability' with respect to the class definition.'"   Colozzi v. St. Joseph's Hosp. Health Ctr., 275 F.R.D. 75, 83 (N.D.N.Y. 2011) (citing In re Initial Pub. Offerings, 471 F.3d 24, 30 (2d Cir. 2006)).   The Court will address each requirement separately.

1.  Numerosity

The first prerequisite that Plaintiffs must establish is that "the class is so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). Defendants here do not dispute that Plaintiffs have satisfied the numerosity requirement, as the prospective class contains approximately 5,000 people (Ray Decl. Ex. B, Golub Dep. Tr. 77). See Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995) ("[N]umerosity is presumed at a level of 40 members . . . .").

2.  Commonality

Although Rule 23(a)(2) states that the commonality requirement is met if "there are questions of law or fact common to the class," FED. R. CIV. P. 23(a)(2), the Supreme Court has recently clarified the meaning of the Rule, stating that "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011) (quoting Falcon, 457 U.S. at 161); see also M.D. ex rel. Stukenberg v. Perry, 675 F.3d 832, 840 (5th Cir. 2012) ("After Wal-Mart, Rule 23(a)(2)'s commonality requirement demands more than the presentation of questions that are common to the class because 'any competently crafted class complaint literally raises common questions.'" (quoting Wal-Mart, 131 S. Ct. at

2551)).  Thus, "[w]hat matters to class certification . . . is
not the raising of common 'questions'--even in droves--but,
rather the capacity of a classwide proceeding to generate common
answers apt to drive the resolution of the litigation."  Wal-
Mart, 131 S. Ct. at 2551 (omission in original) (internal
quotation marks and citation omitted).  In other words, the
class claims "must depend upon a common contention . . . of such
a nature that it is capable of classwide resolution--which means
that the determination of its truth or falsity will resolve an
issue that is central to the validity of each of the class
claims in one stroke."  Id.

Here, although the Named Plaintiffs argue that there
are six distinct questions of law and fact common to all members
of the putative class, only two are worthy of consideration:[5]

---

[5] The other purported common questions are not even arguably
sufficient to support class certification.  First, questions
such as "[w]hether Defendants paid the members of the class the
rate of pay required by the New York and New Jersey Law [sic]"
and "for all of the hours actually worked" (Pls. Mot. 14)
"relate primarily to the level of damages, if any, owing to each
individual," Ramos v. SimplexGrinnell LP, 796 F. Supp. 2d 346,
355 (E.D.N.Y. 2011) (internal quotation marks and citation
omitted), and, thus, are more appropriately characterized as
individualized questions and weigh against class certification.
Second, questions such as "[w]hether Defendants complied with
New York Labor Law and New Jersey wage and hour statutes" (Pls.
Mot. 14-15) are similarly insufficient as "the members of a
proposed class do no establish that 'their claims can
productively be litigated at once,' merely by alleging a
violation of the same legal provision by the same defendant,"
M.D. ex rel. Stukenberg, 675 F.3d at 840 (quoting Wal-Mart, 131
S. Ct. at 2551).  Finally, whether Defendant Goldring may be

(1) "[w]hether Defendants' company-wide policy of automatic deductions for lunch resulted in improper downward adjustments to employee compensation" and (2) "[w]hether Defendants' company-wide telephonic record-keeping practice was defective, thereby resulting in unpaid wages for all hours worked."

With respect to alleged class claims arising out of Defendants' automatic meal deduction policy, the Named Plaintiffs allege that such a policy is "improper" and "unlawful." (Pls. Mot. 13.) This is not true. Courts in this Circuit, including the undersigned, have held that "automatic meal deduction policies are not per se illegal." Wolman v. Catholic Health Sys. of Long Island, Inc., 853 F. Supp. 2d 290, 301 (E.D.N.Y. 2012) ("Defendants' adoption of a system that, by default, deducts meal breaks from its employees' compensation does not constitute a policy that violates the FLSA."); see also Fengler v. Crouse Health Found., Inc., 595 F. Supp. 2d 189, 195 (N.D.N.Y. 2009) ("[T]he mere existence and implementation of a policy or practice of making automatic meal deductions for scheduled meal breaks in and of itself does not violate the FSLA."); Wage & Hour Div., U.S. Dep't of Labor Fact Sheet No.

---

held individually liable (Pls. Mot. 15), although a common question of law applicable to all class claims, does not touch on whether the class members "have suffered the same injury," Falcon, 457 U.S. at 157.

53, The Health Care Industry and Hours Worked (July 2009).[6] Further, "employers utilizing an automatic meal deduction policy may legally shift the burden to their employees to cancel the automatic meal deduction if they work through an unpaid meal." Wolman, 853 F. Supp. 2d at 301; see also Frye v. Baptist Mem'l Hosp., Inc., No. 07-CV-2708, 2010 WL 3862591, at *7 (W.D. Tenn. Sept. 27, 2010) (describing the burden shifting as a "natural consequence of any employer's adopting an automatic meal deduction policy").

What is problematic, however, and a potential violation of the NYLL and NJWHL, is when an employer fails to compensate an employee who worked with the employer's knowledge through an unpaid meal break. See Wolman, 853 F. Supp. 2d at 301; see also Kuebel v. Black & Decker Inc., 643 F.3d 352, 363 (2d Cir. 2011) ("[O]nce an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation simply because the employee failed to properly record or claim his overtime hours."); Saleen v. Waste Mgmt., Inc., 649 F. Supp. 2d 937, 940 (D. Minn. 2009) ("[A]s long as

_____

[6] Although these sources address the legality of automatic meal deduction policies in the context of the FLSA, the relevant portions of the NYLL and NJWHL do not differ substantially from the FLSA. See DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc., 770 F. Supp. 2d 497, 510 n.5 (E.D.N.Y. 2011) (applying the same analysis to FLSA and NYLL claims); Shakib v. Back Bay Rest. Grp., Inc., No. 10-CV-4564, 2011 WL 4594654, at *3 n.2 (D.N.J. Sept. 30, 2011) (applying the same analysis to FLSA and NJHWL claims).

[the employer] reverses the half-hour deduction when it becomes aware that a worker has not taken a meal break, [the employer] does not act unlawfully."). And courts in this Circuit have granted applications for class certification under Rule 23 when all class members are subject to the same policy for voiding the automatic meal deduction. See, e.g., Hamelin v. Faxton-St. Luke's Healthcare, 274 F.R.D. 385, 395 (N.D.N.Y. 2011); Colozzi, 275 F.R.D. at 85 (N.D.N.Y. 2011).

In the present case, however, there was not a single, uniform policy for correcting time-keeping errors (due to both automatic deductions for meal breaks that were never taken and issues with the MITC software). From 2003 through 2006, Defendants used a paper time-keeping system, whereby employees would manually enter their own hours on a daily basis. In 2006, the recordkeeping policy changed to the MITC telephonic system, and Defendants began automatically deducting meal breaks from employees' scheduled shifts. To correct any errors in the time recorded and reported by the MITC software, an employee could either call headquarters (or ask his or her store supervisor to call headquarters) to address the issue informally or submit an "MITC/JCI Phone Problem Call Log" form.

Thus, as the putative class includes all of Defendants' service employees from 2003 through the present, there are two separate policies at issue affecting two distinct

groups of class members. And while the Court "is not bound by the class definition proposed in the complaint," Robidoux v. Celani, 987 F.2d 931, 937 (2d Cir. 1993), and "is empowered under [Rule 23(c)(5)] to carve out an appropriate class-- including the construction of subclasses," Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp., 993 F.2d 11, 14 (2d Cir. 1993), it "is not obligated to implement [Rule 23(c)(5)] on its own initiative," id.; see also U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 408, 100 S. Ct. 1202, 63 L. Ed. 2d 479 (1980) ("[I]t is not the District Court that is to bear the burden of constructing subclasses. That burden is upon the [party seeking class certification] and it is he who is required to submit proposals to the court. The court has no sua sponte obligation to so act."). The Court will not do so here.[7]

As the Named Plaintiffs have failed to establish any questions of law or fact common to all members of their putative class, their motion for class certification must be DENIED.

---

[7] The Court notes that it is not sua sponte creating subclasses in part because the Named Plaintiffs have not submitted any evidence to support the assertion that Defendants' employees were not properly compensated under the pre-2006 paper timekeeping system. Accordingly, rather than narrow the putative class to post-2006, the Court will give the Named Plaintiffs an opportunity to clarify their class definition in a subsequent motion.

3. <u>Typicality</u>

The Court also questions whether the Named Plaintiffs have satisfied Rule 23(a)'s typicality requirement, which "requires that the claims of the class representatives be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" <u>Marisol A.</u>, 126 F.3d at 376 (quoting <u>S.E.C. v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)</u>, 960 F.2d 285, 291 (2d Cir. 1992)). The typicality requirement is not satisfied and class certification is inappropriate, however, "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." <u>Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.</u>, 222 F.3d 52, 59 (2d Cir. 2000) (internal quotation marks and citation omitted).

Here, the Named Plaintiffs--Ines Briceno, Esmeralda Leon, and Francisco Vargas Aguirre, all of whom worked in the J.C. Penney in Massapequa, New York--argue that their claims are typical of the claims of the members of the putative class because they were all "employed by Defendants to perform janitorial work in various retail stores throughout New York and New Jersey[] and were denied compensation that they were legally entitled to receive." (Pls. Mot. 17-18.) The Court disagrees.

Although the Named Plaintiffs were all subject to the alleged unlawful timekeeping policies discussed above,[8] there appears to have been an additional issue in the Massapequa store--namely, that employees were directed by the store supervisor to log in and out using ghost employees' names and pin numbers rather than their own names and numbers and, thus, they were not properly compensated for all hours worked. See supra pages 6-7. This issue appears to have been unique to the Massapequa location, and there is evidence in the record to suggest that it resulted in unpaid wages (see, e.g., Ambinder Decl. Ex. S, Vargas Dep. Tr. 96-97 (testifying that he was required to pay Rene Chicas' wages out of his own pocket); Ray Decl. Ex. A, Baranker Dep. Tr. 51-52 (testifying that the supervisor would personally cash the ghost employees' paychecks and pay his employees in cash)).

---

[8] The Court questions whether Plaintiff Vargas was subject to the automatic meal deduction policy or the telephonic recordkeeping system because he asserts in his affidavit that he was only employed by Defendants from 2001 through 2003--well before the policies at issue were implemented. (Ambinder Decl. Ex. E, Vargas Aff. ¶ 3; see also Ambinder Decl. Ex. S, Vargas Dep. Tr. 80 ("Q: Okay, but are you absolutely sure that you only worked at USI from 2001 to 2003? A: Yes). But see Ambinder Decl. Ex. E, Vargas Aff. ¶¶ 8-9 (discussing problems with phone system); Ambinder Decl. Ex. S, Vargas Dep. Tr. 89 (same).) The Named Plaintiffs attempt to refute this by submitting copies of paystubs dated 2007 and 2008 for a "Francisco A. Vargas" (see Ambinder Suppl. Decl. Ex. B2), but Mr. Vargas was shown these paystubs during his deposition and he stated that he did not know why he would be receiving paystubs dated 2007 or 2008 as he was only employed by Defendants through 2003 (Ambinder Decl. Ex. S, Vargas Dep. Tr. 78-79).

Further, there is also evidence in the record to suggest that the supervisors in the Massapequa store intentionally falsified the backup timesheets. (See, e.g., Ray Decl. Ex. C, Leon Dep. Tr. 55.) It is unclear from the record submitted in support of this motion to what extent the Named Plaintiffs' alleged unpaid wages were caused by Defendants' recordkeeping policy (the issue common to all class members) as opposed to the falsified records in the Massapequa J.C. Penney, and the Named Plaintiffs failed to address this issue in their briefing.[9]

Thus, the Court finds that the Named Plaintiffs have failed to satisfy their burden of establishing that the issues that they faced in the Massapequa store were typical of the claims of the remaining class members.

### 4. Adequacy of Class Representation

The adequacy requirement under Rule 23(a)(4) "is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." Denney v. Deutsche Bank AG, 443 F.3d 253, 268 (2d Cir. 2006). Defendants argue that the Named Plaintiffs are

---

[9] The Court notes that the Named Plaintiffs touched on the issue only briefly in a footnote of their reply brief. (Pls. Reply 10 n.12.) If they wish to renew their motion, they must either narrow their proposed class to those individuals working in the Massapequa store or fully explain why the issue articulated herein would not predominate over the purported class claims.

not adequate class representatives because (1) Ms. Leon and Ms. Briceno's working under false names evinces a lack of credibility and (2) they have failed to amend their discovery responses after receiving Defendants' records "to produce/identify any documents that support their claims." (Defs. Opp. 16.)[10] The Court disagrees. <u>First</u>, as explained above, Plaintiffs Leon and Briceno were directed to record their time under false names. <u>See</u> <u>supra</u> page 7. <u>Second</u>, the purported discovery abuses alleged by Defendants do not suggest "a disregard or inability to comply with discovery requests." <u>Koss v. Wackenhut Corp.</u>, No. 03-CV-7679, 2009 WL 928087, at *7 (S.D.N.Y. Mar. 30, 2009).[11] Rather, to the contrary, the Named Plaintiffs have all appeared for depositions, provided affidavits in support of the class claims, and expressed a

---

[10] Defendants also assert that Mr. Vargas is not an adequate class representative due to the inconsistencies in his testimony during the course of discovery (i.e., that he only worked for Defendants from 2001 through 2003 yet he utilized the telephonic recordkeeping system). To the extent that the Named Plaintiffs seek to have Vargas represent the interests of the putative class members who were employed from 2006 to the present, the Court agrees with Defendants. However, the putative class also includes those individuals who were subject to the paper timekeeping system.

[11] Defendants appear to be arguing that the Named Plaintiffs did not supplement their document production to Defendants with documents provided by Defendants. (See Ray Decl. ¶¶ 9-10.) But this makes no sense. A party is not required to produce documents to its adversary that were provided by their adversary in the first instance. That would be a waste of everyone's time and resources.

24

willingness and desire to represent the interests of the putative class. Finally, "[c]ourts that have denied class certification based on the inadequate qualifications of plaintiffs have done so only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." In re Frontier Ins. Grp., Inc. Sec. Litig., 172 F.R.D. 31, 47 (E.D.N.Y. 1997) (internal quotation marks and citations omitted). This is not such a case.

B.    Predominance of Common Questions of Law or Fact

In addition to satisfying the prerequisites articulated in Rule 23(a), a party seeking class certification must also establish that the putative class fits into one of the categories enumerated in Rule 23(b). Here, the Named Plaintiffs argue that their putative class fits into Rule 23(b)(3), which states that a class action may be maintained if: "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

Given that the proposed class has failed to satisfy Rule 23's prerequisites, the Court need not determine whether it fits into one of the Rule 23(b) categories. Nonetheless, as the Court is giving the Named Plaintiffs leave to redefine the proposed class, it will briefly address some of the arguments raised by Defendants. <u>First</u>, Defendants argue that the Named Plaintiffs cannot prove that the policy in place for correcting timekeeping errors resulted in unpaid wages, and they assert that any unpaid wages were caused by human error which would require a case by case analysis. While this may ultimately be true, this argument is more appropriate for trial: At trial, the Named Plaintiffs will have to prove that Defendants' <u>policies</u> violated the NYLL and NJWHL or they will be unable to succeed on their class claims. <u>Second</u>, Defendants argue that "class certification will undoubtedly become mired in hundreds of mini-trials to determine whether the putative class members were not compensated properly either due to an ineffective timekeeping system or improper meal break deductions." (Defs. Opp. 23.) This exact argument was rejected by Judge David N. Hurd in a similar case in the Northern District of New York, who stated that: "Considering the numbers alone, it is evident that a class action is superior to the adjudication of dozens, or hundreds, of separate actions." <u>Colozzi</u>, 275 F.R.D. at 88. <u>Finally</u>, "the existence of individualized claims for damages,

alone, is not a barrier to class certification . . . ." <u>Id.</u> at 89.

CONCLUSION

For the foregoing reasons, the Named Plaintiffs' motion is DENIED. However, the Court GRANTS the Named Plaintiffs leave to redefine their proposed class to address all of the issues articulated herein in a renewed motion. Specifically, if the Named Plaintiffs choose to renew their motion (which they are not obligated to do), they must, <u>at a minimum</u>:

(1) Clarify whether they also challenge the policies in place for correcting timekeeping errors prior to the implementation of the telephonic recordkeeping policy and provide evidence in support of such a class definition; and

(2) Provide further briefing on whether the issues unique to the Massapequa store predominate over the issues applicable to the class as a whole and/or appropriately narrow the scope of the class or change the designated class representatives.

The Clerk of the Court is directed to amend the spellings of the Named Plaintiffs' names on the docket to conform to the caption herein.

SO ORDERED.


/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:      September   28  , 2012
             Central Islip, NY